## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOSAID TECHNOLOGIES INCORPORATED )<br>11 Hines Road )<br>Suite 203 )<br>Ottawa, Canada K2k 2x1 )<br>    )<br>    Plaintiff, )<br>    )<br>    v. )<br>    )<br>HON. DAVID KAPPOS )<br>Under Secretary of Commerce for Intellectual )<br>Property and Director of the United States )<br>Patent and Trademark Office )<br>Madison Building )<br>600 Dulany Street )<br>Alexandria, VA 22314 )<br>    )<br>    Defendant. )<br> )| Civil Action No.---- |

### COMPLAINT

Plaintiff Mosaid Technologies Incorporated ("Mosaid"), for its complaint against defendant the Honorable David Kappos, states as follows:

1. This is an action by the owner of United States Patent No. 7,522,615 ("the '615 patent") seeking review of inaccurate and erroneous patent term adjustment calculations made by the United States Patent and Trademark Office ("USPTO"). Specifically, this is an action by Plaintiffs under 35 U.S.C. § 154(b)(4)(A) seeking a judgment that the patent term adjustment of 1287 days calculated by the USPTO for the '615 patent should be corrected to 1414 days.

2. This action arises under 35 U.S.C. § 154 and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## I. THE PARTIES

3.  Plaintiff Mosaid is a company operating under the laws of Canada. Mosaid is located at 11 Hines Road Suite 203 Ottawa, Canada K2k 2x1.

4.  Defendant David Kappos is the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office. Defendant is sued in his official capacity.

## II. JURISDICTION AND VENUE

5.  This Court has jurisdiction over this action and is authorized to issue the requested relief to Plaintiff pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1361; 35 U.S.C. § l54(b)(4)(A) and 5 U.S.C. §§ 701-706.

6.  Venue is proper in this district pursuant to 35 U.S.C. § 154(b)(4)(A).

7.  This Complaint is being timely filed in accordance with 35 U.S.C. § 154(b)(4)(A) and FRCP 6(a)(3).

## III. BACKGROUND

8.  The '615 patent issued to Yehuda Binder on April 21, 2009, based on patent application number 10/491,989, filed on April 7, 2004, which is a national stage application of PCT/IL03/00948, filed on November 12, 2003, which claims priority to Israeli patent application no. 152824, filed November 13, 2002. The '615 patent is attached hereto as Exhibit A.

9.  Plaintiff Mosaid is the assignee of the '615 patent and is the real party in interest in this case, as evidenced by an assignment document from the inventors to Serconet Ltd., recorded in the USPTO on December 7, 2005, at Reel/Frame 016865/0062, and an assignment document from Serconet Ltd. to Mosaid, recorded in the USPTO on March 25, 2009, at Reel/Frame 022449/0101.

10.    When the USPTO issued the '615 patent on April 21, 2009, it erroneously calculated the entitled patent term adjustment ("PTA") for the '615 patent as 1287 days. Had the USPTO calculated the entitled patent term adjustment properly, the '615 patent would be entitled to 1414 days of patent term adjustment.

11.    The errors in the USPTO's patent term adjustment calculations are detailed in a recent order from the U. S. District Court for the District of Columbia in an action titled *Wyeth* v. *Dudas,* 580 F. Supp. 2d 138 (D.D.C. Sept. 30, 2008), where the Court granted summary judgment against the USPTO, holding that the USPTO's patent term adjustment calculation methodology was erroneous as a matter of law and inconsistent with the Patent Statute.

12.    The correct patent term adjustment methodology identified in the prior *Wyeth* v. *Dudas* action governs the USPTO's calculation of patent term adjustment for Plaintiff's '615 patent.

### IV. COUNT I:  U.S. PATENT NO. 7,522,615

13.    Plaintiff incorporates by reference the allegations in paragraphs 1-12 above, as if fully set forth herein.

14.    During prosecution of the '615 patent, the patent owner accrued 1287 days of patent term adjustment under 35 U.S.C. § 154(b)(1)(A), and accrued 745 days of patent term adjustment under 35 U.S.C. § 154(b)(1)(B).

15.    Under the USPTO's interpretation of 35 U.S.C. § 154, all PTA accrued under 35 U.S.C. § 154(b)(l)(A) and all PTA accrued under 35 U.S.C. § 154(b)(l)(B) inherently overlaps and, thus, it has been the USPTO position that a patent holder is only eligible for the larger of these two amounts of PTA, 1287 days. For the '615 patent, the USPTO erroneously limited the patent term adjustment for the '615 patent to 1287 days (*see* calculation in paragraph 21, below), as shown on the face of the '615 patent.

16.     In view of a recent decision from this Court (*Wyeth v. Dudas, supra*), all days on which 35 U.S.C. § 154(b)(1)(A) or 35 U.S.C. § 154(b)(l)(B) apply should accrue patent term adjustment for the '615 patent.

17.     Each day from the day after June 7, 2005 (14 months from the 371(c) date) through to the issuance of a first action Notice of Allowance on December 15, 2008, qualify for patent term adjustment under 35 U.S.C. § 154(b)(1)(A), a total of 1287 days.

18.     Furthermore, each day from the day after April 7, 2007 (3 years from the actual filing date in the United States) through to the date of issue on April 21, 2009, qualify for patent term adjustment under 35 U.S.C. § 154(b)(l)(B), a total of 745 days.

19.     Under the interpretation of this Court (*Wyeth v. Dudas, supra*), the only period of actual calendar days overlap between the time periods of delay calculated under 35 U.S.C. § 154(b)(1)(A) and 35 U.S.C. § 154(b)(1)(B), from April 7, 2007, until December 15, 2008, which amounts to 618 days, and the total USPTO prosecution delay is accordingly 1287 + 745 − 618 = 1414 days, minus any period attributed to disclaimed term or applicant's delay under 35 U.S.C. § (154(b)(2)(B) or (C).

20.     Plaintiff agrees with the USPTO's holding of a total applicant prosecution delay of 0 days under 35 U.S.C. § 154(b)(2)(B) or (C).

21.     Under the USPTO's interpretation, the USPTO had calculated an erroneous patent term adjustment of 1287 - 0 = 1287 days.

22.     The correct overall Patent Term Adjustment accrued by the patent holder is 1287 + 745 − 618 - 0 = **1414 days**, and the patent holder is therefore entitled to 1414 − 1287 = **127 ADDITIONAL days** of patent term adjustment.

23.     On June 22, 2009, Plaintiff filed a request for reconsideration of patent term adjustment in the USPTO (Exhibit B), which set forth the basis for Plaintiff's determination that the PTA

was incorrect.  By decision mailed on September 9, 2009 (Exhibit C), the request was dismissed and no adjustment was made.

WHEREFORE, Plaintiff respectfully prays that this Court:

A.      Issue an Order changing the period of patent term adjustment for the '615 patent term from 1287 days to 1414 days and requiring Defendant to alter the terms of the '615 patent to reflect the 1414 days of actual patent term adjustment due the'615 patent.

B.      Grant such other and further relief as the nature of the case may admit or require and as may be just and equitable.

Dated: October 19, 2009

Respectfully submitted,

MOSAID TECHNOLOGIES INCORPORATED

By: _____

Roger L. Browdy (DC Bar No. 164,251)
Ronni S. Jillions (DC Bar No. 375,817)
BROWDY AND NEIMARK, P.L.L.C
624 Ninth Street, N.W.
Washington, DC 20001
Tel.:  (202) 628-5197
Fax:  (202) 737-3528
Email:  rlbrowdy@browdyneimark.com
          rsjillions@browdyneimark.com

Attorneys for Plaintiff

Address for mail:
BROWDY AND NEIMARK, P.L.L.C.
624 Ninth Street, NW
Washington, DC 20001
(202) 202-628-5197

G:\INT\MosaidvDoll\Binder22\2009-10-19 Complaint Mosaid BINDER22.doc

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOSAID TECHNOLOGIES INCORPORATED<br>11 Hines Road<br>Suite 203<br>Ottawa, Canada K2k 2x1<br><br>        Plaintiff,<br><br>             v.<br><br>HON. DAVID KAPPOS<br>Under Secretary of Commerce for Intellectual<br>Property and Director of the United States<br>Patent and Trademark Office<br>Madison Building<br>600 Dulany Street<br>Alexandria, VA 22314<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. ---- |

# Exhibit A

US007522615B2

(12) **United States Patent**
Binder

(10) **Patent No.:** **US 7,522,615 B2**
(45) **Date of Patent:** **Apr. 21, 2009**

(54) **ADDRESSABLE OUTLET, AND A NETWORK USING SAME**

(75) Inventor: **Yehuda Binder**, Hod Hasharon (IL)

(73) Assignee: **Serconet, Ltd.,** Ra'anana (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1287 days.

(21) Appl. No.: **10/491,989**

(22) PCT Filed: **Nov. 12, 2003**

(86) PCT No.: **PCT/IL03/00948**

§ 371 (c)(1),
(2), (4) Date: **Apr. 7, 2004**

(87) PCT Pub. No.: **WO2004/045151**

PCT Pub. Date: **May 27, 2004**

(65) **Prior Publication Data**

US 2005/0025162 A1    Feb. 3, 2005

(30) **Foreign Application Priority Data**

Nov. 13, 2002    (IL)    ..................................... 152824

(51) **Int. Cl.**
*H04L 12/28* (2006.01)
(52) **U.S. Cl.** ..................................... **370/401**; 370/419
(58) **Field of Classification Search** ................ 370/401, 370/419, 356, 281, 295, 465, 468; 375/219, 375/222; 455/402
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,699,523 A | 10/1972 | Percher |
| 3,717,858 A | 2/1973 | Hadden |
| 3,739,226 A | 6/1973 | Seiter |
| 3,805,265 A | 4/1974 | Lester |
| 3,872,319 A | 3/1975 | Platzer |
| 3,959,772 A | 5/1976 | Wakasa et al. |
| 4,272,759 A | 6/1981 | Handy |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0 200 016 A2    11/1986

(Continued)

OTHER PUBLICATIONS

Grayson Evans, The CEBUs Standard User's Guide, 1st edition, May 1996, 317 pages.

(Continued)

*Primary Examiner*—Sam Bhattacharya
(74) *Attorney, Agent, or Firm*—Browdy and Neimark, P.L.L.C.

(57) **ABSTRACT**

An addressable outlet for use as part of local area network based on wiring installed in a building, such as telephone, electrical, cable television, dedicated wiring, and the like. The use of such wiring for data communications networks in addition to the wiring's primary usage creates a need for ways of determining the condition of the network and monitoring this information remotely. Network condition includes such factors as continuity of wiring, connector status, connected devices, topology, signal delays, latencies, and routing patterns. Providing basic processing and addressing capabilities within the outlet permits messaging to and from specific individual outlets, thereby allowing inquiries and reports of the condition of the immediate environment of each outlet. In addition, outlets can be configured with sensors to report on voltage, temperature, and other measurable quantities.

**7 Claims, 9 Drawing Sheets**



**US 7,522,615 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,389,694 | A | 6/1983 | Cornwell, Jr. |
| 4,463,341 | A | 7/1984 | Iwasaki |
| 4,467,314 | A | 8/1984 | Weikel et al. |
| 4,477,896 | A | 10/1984 | Aker |
| 4,484,185 | A | 11/1984 | Graves |
| 4,535,401 | A | 8/1985 | Penn |
| 4,633,217 | A | 12/1986 | Akano |
| 4,636,914 | A | 1/1987 | Belli |
| 4,639,714 | A | 1/1987 | Crowe |
| 4,647,725 | A | 3/1987 | Dellinger et al. |
| 4,651,022 | A | 3/1987 | Cowley |
| 4,733,389 | A | 3/1988 | Puvogel |
| 4,734,919 | A | 3/1988 | Tae |
| 4,736,367 | A | 4/1988 | Wroblewski et al. |
| 4,750,094 | A | 6/1988 | Krasik |
| 4,755,792 | A | 7/1988 | Pezzolo et al. |
| 4,761,646 | A | 8/1988 | Choquet et al. |
| 4,785,448 | A | 11/1988 | Reichert et al. |
| 4,787,082 | A | 11/1988 | Delaney et al. |
| 4,799,211 | A | 1/1989 | Felker et al. |
| 4,803,485 | A | 2/1989 | Rypinski |
| 4,806,905 | A | 2/1989 | McGowan, III et al. |
| 4,814,941 | A | 3/1989 | Speet et al. |
| 4,815,106 | A | 3/1989 | Propp et al. |
| 4,866,733 | A | 9/1989 | Morishita |
| 4,890,102 | A | 12/1989 | Oliver |
| 4,918,690 | A | 4/1990 | Markkula, Jr. et al. |
| 4,924,349 | A | 5/1990 | Buehler et al. |
| 4,926,158 | A | 5/1990 | Zeigler |
| 4,937,811 | A | 6/1990 | Harris |
| 4,953,055 | A | 8/1990 | Douhet et al. |
| 4,992,774 | A | 2/1991 | McCullough |
| 5,010,399 | A | 4/1991 | Goodman |
| 5,021,779 | A | 6/1991 | Bisak |
| 5,032,819 | A | 7/1991 | Sakuragi et al. |
| 5,033,062 | A | 7/1991 | Morrow et al. |
| 5,033,112 | A | 7/1991 | Bowling et al. |
| 5,034,531 | A | 7/1991 | Friary et al. |
| 5,065,133 | A | 11/1991 | Howard |
| 5,068,890 | A | 11/1991 | Nilssen |
| 5,089,927 | A | 2/1992 | Bulan et al. |
| 5,089,974 | A | 2/1992 | Demeyer et al. |
| 5,114,365 | A | 5/1992 | Thompson |
| 5,121,482 | A | 6/1992 | Patton |
| 5,144,544 | A | 9/1992 | Jenneve et al. |
| 5,148,144 | A | 9/1992 | Sutterlin et al. |
| 5,192,231 | A | 3/1993 | Dolin |
| 5,285,477 | A | 2/1994 | Leonowich |
| 5,311,518 | A | 5/1994 | Takato et al. |
| 5,347,549 | A | 9/1994 | Baumann et al. |
| 5,368,041 | A | 11/1994 | Shambroom |
| 5,381,804 | A | 1/1995 | Shambroom |
| 5,391,932 | A | 2/1995 | Small et al. |
| 5,402,902 | A | 4/1995 | Bouley |
| 5,406,260 | A | 4/1995 | Cummings et al. |
| 5,414,708 | A | 5/1995 | Webber et al. |
| 5,422,519 | A | 6/1995 | Russell |
| 5,438,678 | A | 8/1995 | Smith |
| 5,450,393 | A | 9/1995 | Watanabe et al. |
| 5,451,923 | A | 9/1995 | Seberger et al. |
| 5,457,629 | A | 10/1995 | Miller et al. |
| 5,469,150 | A | 11/1995 | Sitte |
| 5,473,517 | A | 12/1995 | Blackmon |
| 5,477,091 | A | 12/1995 | Fiorina et al. |
| 5,483,656 | A | 1/1996 | Oprescu et al. |
| 5,491,402 | A | 2/1996 | Small |
| 5,500,794 | A | 3/1996 | Fujita |
| 5,517,172 | A | 5/1996 | Chiu |
| 5,525,962 | A | 6/1996 | Tice |
| 5,528,089 | A | 6/1996 | Guiset et al. |
| 5,530,748 | A | 6/1996 | Ohmori |
| 5,535,336 | A | 7/1996 | Smith et al. |
| 5,539,821 | A | 7/1996 | Blonder |
| 5,546,385 | A | 8/1996 | Caspi et al. |
| 5,563,515 | A | 10/1996 | Kako |
| 5,563,782 | A | 10/1996 | Chen et al. |
| 5,569,209 | A | 10/1996 | Reitman |
| 5,572,182 | A | 11/1996 | De Pinho Filho et al. |
| 5,574,256 | A | 11/1996 | Cottone |
| 5,579,486 | A | 11/1996 | Oprescu et al. |
| 5,610,552 | A | 3/1997 | Schlesinger et al. |
| 5,635,896 | A | 6/1997 | Tinsley et al. |
| 5,644,286 | A | 7/1997 | Brosh et al. |
| 5,652,893 | A | 7/1997 | Ben-Meir et al. |
| 5,680,397 | A | 10/1997 | Christensen et al. |
| 5,684,826 | A | 11/1997 | Ratner |
| 5,689,230 | A | 11/1997 | Merwin et al. |
| 5,708,705 | A | 1/1998 | Yamashita |
| 5,712,614 | A | 1/1998 | Patel et al. |
| 5,722,076 | A | 2/1998 | Sakabe et al. |
| 5,736,965 | A | 4/1998 | Mosebrook et al. |
| 5,748,634 | A | 5/1998 | Sokol et al. |
| 5,796,965 | A | 8/1998 | Choi et al. |
| 5,799,196 | A | 8/1998 | Flannery |
| 5,801,635 | A | 9/1998 | Price |
| 5,805,597 | A | 9/1998 | Edem |
| 5,812,750 | A | 9/1998 | Dev et al. |
| 5,815,681 | A | 9/1998 | Kikinis |
| 5,828,293 | A | 10/1998 | Rickard |
| 5,828,558 | A | 10/1998 | Korcharz et al. |
| 5,833,350 | A | 11/1998 | Moreland |
| 5,841,360 | A | 11/1998 | Binder |
| 5,848,054 | A | 12/1998 | Mosebrook et al. |
| 5,859,584 | A | 1/1999 | Counsell et al. |
| 5,859,596 | A | 1/1999 | McRae |
| 5,884,086 | A | 3/1999 | Amoni et al. |
| 5,895,985 | A | 4/1999 | Fischer |
| 5,896,443 | A | 4/1999 | Dichter et al. |
| 5,939,801 | A | 8/1999 | Bouffard et al. |
| 5,944,831 | A | 8/1999 | Pate et al. |
| 5,960,208 | A | 9/1999 | Obata et al. |
| 5,968,118 | A | 10/1999 | Sutton |
| 5,973,942 | A | 10/1999 | Nelson et al. |
| 5,974,553 | A | 10/1999 | Gandar |
| 5,982,052 | A | 11/1999 | Sosnowski |
| 5,990,577 | A | 11/1999 | Kamioka et al. |
| 5,991,885 | A | 11/1999 | Chang et al. |
| 5,994,998 | A | 11/1999 | Fisher et al. |
| 6,010,228 | A | 1/2000 | Blackman |
| 6,016,519 | A | 1/2000 | Chida et al. |
| 6,025,945 | A | 2/2000 | Nyu et al. |
| 6,033,101 | A | 3/2000 | Reddick et al. |
| 6,038,457 | A | 3/2000 | Barkat |
| 6,049,471 | A | 4/2000 | Korcharz et al. |
| 6,049,881 | A | 4/2000 | Massman et al. |
| 6,055,633 | A | 4/2000 | Schrier et al. |
| 6,061,261 | A | 5/2000 | Chen et al. |
| 6,087,835 | A | 7/2000 | Haneda |
| 6,095,867 | A | 8/2000 | Brandt et al. |
| 6,097,761 | A | 8/2000 | Buhring et al. |
| 6,114,632 | A | 9/2000 | Planas, Sr. et al. |
| 6,115,468 | A | 9/2000 | De Nicolo |
| 6,115,755 | A | 9/2000 | Krishan |
| 6,115,822 | A | 9/2000 | Kim et al. |
| 6,123,577 | A | 9/2000 | Contois et al. |
| 6,125,448 | A | 9/2000 | Schwan et al. |
| 6,141,763 | A | 10/2000 | Smith et al. |
| 6,166,496 | A | 12/2000 | Lys et al. |
| 6,175,556 | B1 | 1/2001 | Allen, Jr. et al. |
| 6,188,314 | B1 | 2/2001 | Wallace et al. |
| 6,188,557 | B1 | 2/2001 | Chaudhry |
| 6,192,399 | B1 | 2/2001 | Goodman |
| 6,207,895 | B1 | 3/2001 | Engel |
| 6,216,160 | B1 | 4/2001 | Dichter |

| | | | |
|---|---|---|---|
| 6,218,930 | B1 | 4/2001 | Katzenberg et al. |
| 6,222,124 | B1 | 4/2001 | Pritchard |
| 6,222,853 | B1 | 4/2001 | Marttinen et al. |
| 6,243,571 | B1 | 6/2001 | Bullock et al. |
| 6,243,818 | B1 | 6/2001 | Schwan et al. |
| 6,246,748 | B1 | 6/2001 | Yano |
| 6,252,754 | B1 | 6/2001 | Chaudhry |
| 6,282,075 | B1 | 8/2001 | Chaudhry |
| 6,297,450 | B1 | 10/2001 | Yu |
| 6,301,527 | B1 | 10/2001 | Butland et al. |
| 6,308,240 | B1 | 10/2001 | De Nicolo |
| 6,310,781 | B1 | 10/2001 | Karam |
| 6,348,874 | B1 | 2/2002 | Cole et al. |
| 6,362,987 | B1 | 3/2002 | Yurek et al. |
| 6,363,066 | B1 | 3/2002 | Frimodig |
| 6,364,535 | B1 | 4/2002 | Coffey |
| 6,366,143 | B1 | 4/2002 | Liu et al. |
| 6,377,874 | B1 | 4/2002 | Ykema |
| 6,380,852 | B1 | 4/2002 | Hartman et al. |
| 6,389,139 | B1 | 5/2002 | Curtis et al. |
| 6,393,607 | B1 | 5/2002 | Hughes et al. |
| 6,396,391 | B1 | 5/2002 | Binder |
| 6,397,288 | B1 | 5/2002 | Rye et al. |
| 6,420,964 | B1 | 7/2002 | Nishikawa |
| 6,433,672 | B1 | 8/2002 | Shirmard |
| 6,441,723 | B1 | 8/2002 | Mansfield, Jr. et al. |
| 6,448,899 | B1 | 9/2002 | Thompson |
| 6,449,348 | B1 | 9/2002 | Lamb et al. |
| 6,459,175 | B1 | 10/2002 | Potega |
| 6,459,275 | B1 | 10/2002 | Ewalt et al. |
| 6,470,401 | B1 | 10/2002 | Peterson |
| 6,473,608 | B1 | 10/2002 | Lehr et al. |
| 6,474,829 | B2 | 11/2002 | Clodfelter |
| 6,475,022 | B2 | 11/2002 | Tamino |
| 6,477,457 | B1 | 11/2002 | Fendt et al. |
| 6,480,122 | B1 | 11/2002 | Oddy et al. |
| 6,481,013 | B1 | 11/2002 | Dinwiddie et al. |
| 6,492,897 | B1 | 12/2002 | Mowery, Jr. |
| 6,496,103 | B1 | 12/2002 | Weiss et al. |
| 6,507,322 | B2 | 1/2003 | Fang |
| 6,518,724 | B2 | 2/2003 | Janik |
| 6,522,515 | B1 | 2/2003 | Whitney |
| 6,529,443 | B2 | 3/2003 | Downey, Jr. et al. |
| 6,535,983 | B1 | 3/2003 | McCormack et al. |
| 6,541,878 | B1 | 4/2003 | Diab |
| 6,543,940 | B2 | 4/2003 | Chu |
| 6,546,494 | B1 | 4/2003 | Jackson et al. |
| 6,553,076 | B1 | 4/2003 | Huang |
| 6,556,564 | B2 | 4/2003 | Rogers |
| 6,560,319 | B1 | 5/2003 | Binder |
| 6,571,181 | B1 | 5/2003 | Rakshani et al. |
| 6,574,741 | B1 | 6/2003 | Fujimori et al. |
| 6,587,454 | B1 | 7/2003 | Lamb |
| 6,601,097 | B1 | 7/2003 | Cheston et al. |
| 6,603,220 | B2 | 8/2003 | Vergnaud |
| 6,640,308 | B1 | 10/2003 | Keyghobad et al. |
| 6,643,566 | B1 | 11/2003 | Lehr et al. |
| 6,648,308 | B2 | 11/2003 | Gunnar Rothoff |
| 6,650,622 | B1 | 11/2003 | Austerman, III et al. |
| 6,653,932 | B1 | 11/2003 | Beamish et al. |
| 6,658,109 | B1 | 12/2003 | Steinke et al. |
| 6,681,013 | B1 | 1/2004 | Miyamoto |
| 6,690,677 | B1 | 2/2004 | Binder |
| 6,701,443 | B1 | 3/2004 | Bell |
| 6,710,553 | B2 | 3/2004 | Lagan |
| 6,715,087 | B1 | 3/2004 | Vergnaud et al. |
| 6,738,641 | B1 | 5/2004 | Elsasser |
| 6,747,859 | B2 | 6/2004 | Walbeck et al. |
| 6,762,675 | B1 | 7/2004 | Cafiero et al. |
| 6,764,343 | B2 | 7/2004 | Ferentz |
| 6,765,149 | B1 | 7/2004 | Ku |
| 6,778,817 | B1 | 8/2004 | Bullock et al. |
| 6,800,957 | B2 | 10/2004 | Nerone et al. |
| 6,804,351 | B1 | 10/2004 | Karam |
| 6,822,946 | B1 | 11/2004 | Wallace |
| 6,838,997 | B1 | 1/2005 | Davidson |
| 6,841,979 | B2 | 1/2005 | Pincu et al. |
| 6,842,459 | B1 | 1/2005 | Binder |
| 6,854,895 | B2 | 2/2005 | Coffey et al. |
| 6,856,799 | B1 | 2/2005 | Ritter |
| 6,864,798 | B2 | 3/2005 | Janik |
| 6,868,265 | B2 | 3/2005 | Zodnik |
| 6,870,282 | B1 | 3/2005 | Bischoff et al. |
| 6,880,020 | B1 | 4/2005 | Rubinstein et al. |
| 6,901,439 | B1 | 5/2005 | Bonasia et al. |
| 6,906,618 | B2 | 6/2005 | Hair, III et al. |
| 6,907,458 | B2 | 6/2005 | Tamassetti |
| 6,912,145 | B2 | 6/2005 | Hung et al. |
| 6,912,282 | B2 | 6/2005 | Karam |
| 6,927,340 | B1 | 8/2005 | Binder |
| 6,932,624 | B1 | 8/2005 | Hoopes |
| 6,933,686 | B1 | 8/2005 | Bishel |
| 6,934,300 | B2 | 8/2005 | Tamassetti |
| 6,937,056 | B2 | 8/2005 | Binder |
| 6,940,956 | B1 | 9/2005 | Leach |
| 6,943,296 | B2 | 9/2005 | Perrella et al. |
| 6,943,683 | B2 | 9/2005 | Perret |
| 6,946,988 | B2 | 9/2005 | Edwards |
| 6,954,863 | B2 | 10/2005 | Mouton |
| 6,955,560 | B1 | 10/2005 | Biggs |
| 6,956,462 | B2 | 10/2005 | Jetzt |
| 6,956,826 | B1 | 10/2005 | Binder |
| 6,961,303 | B1 | 11/2005 | Binder |
| 6,973,394 | B2 | 12/2005 | Jaeger et al. |
| 6,975,209 | B2 | 12/2005 | Gromov |
| 6,977,507 | B1 | 12/2005 | Pannell et al. |
| 6,981,892 | B1 | 1/2006 | Kostalnik |
| 6,986,071 | B2 | 1/2006 | Darshan et al. |
| 6,993,289 | B2 | 1/2006 | Janik |
| 6,996,458 | B2 | 2/2006 | Pincu et al. |
| 7,003,102 | B2 | 2/2006 | Kiko |
| 7,023,809 | B1 | 4/2006 | Rubenstein |
| 7,026,730 | B1 | 4/2006 | Marshall et al. |
| 7,027,483 | B2 | 4/2006 | Santhoff |
| 7,030,733 | B2 | 4/2006 | Abbarin |
| 7,034,225 | B2 | 4/2006 | Thompson |
| 7,046,983 | B2 | 5/2006 | Elkayam et al. |
| 7,049,514 | B2 | 5/2006 | Brandt et al. |
| 7,053,501 | B1 | 5/2006 | Barrass |
| 7,061,142 | B1 | 6/2006 | Marshall |
| 7,068,781 | B2 | 6/2006 | Le Creff et al. |
| 7,072,995 | B1 | 7/2006 | Burroughs |
| 7,079,647 | B2 | 7/2006 | Tomobe |
| 7,081,827 | B2 | 7/2006 | Addy |
| 7,089,126 | B2 | 8/2006 | Muir |
| 7,106,721 | B1 | 9/2006 | Binder |
| 7,317,793 | B2 | 1/2008 | Binder |
| 2001/0030470 | A1 | 10/2001 | Waugh |
| 2002/0038153 | A1 | 3/2002 | Amodeo |
| 2002/0039388 | A1 | 4/2002 | Smart et al. |
| 2002/0063584 | A1 | 5/2002 | Molenda et al. |
| 2002/0104009 | A1 | 8/2002 | Zodnik |
| 2002/0166125 | A1 | 11/2002 | Fulmer, II |
| 2002/0194383 | A1 | 12/2002 | Cohen et al. |
| 2002/0194605 | A1 | 12/2002 | Cohen et al. |
| 2003/0039257 | A1 | 2/2003 | Manis et al. |
| 2003/0061522 | A1 | 3/2003 | Ke et al. |
| 2003/0062990 | A1 | 4/2003 | Schaeffer, Jr. et al. |
| 2003/0099228 | A1 | 5/2003 | Alcock |
| 2003/0112965 | A1 | 6/2003 | McNamara et al. |
| 2003/0133476 | A1 | 7/2003 | Stone et al. |
| 2003/0151695 | A1 | 8/2003 | Sahlin et al. |
| 2003/0154273 | A1 | 8/2003 | Caveney |
| 2003/0154276 | A1 | 8/2003 | Caveney |
| 2003/0224728 | A1 | 12/2003 | Heinonen et al. |
| 2004/0013098 | A1 | 1/2004 | Tseng et al. |

## US 7,522,615 B2

Page 4

| | | |
|---|---|---|
| 2004/0033817 A1 | 2/2004 | Gorsulch |
| 2004/0073597 A1 | 4/2004 | Caveney et al. |
| 2004/0121648 A1 | 6/2004 | Voros |
| 2004/0125819 A1 | 7/2004 | Binder |
| 2004/0136384 A1 | 7/2004 | Cho |
| 2004/0146061 A1 | 7/2004 | Bisceglia et al. |
| 2004/0147232 A1 | 7/2004 | Zodnik |
| 2004/0162117 A1 | 8/2004 | Liebenow |
| 2004/0164619 A1 | 8/2004 | Parker et al. |
| 2004/0192285 A1 | 9/2004 | Capobianco et al. |
| 2004/0198236 A1 | 10/2004 | Paine et al. |
| 2004/0204017 A1 | 10/2004 | Eckel et al. |
| 2004/0230846 A1 | 11/2004 | Mancey et al. |
| 2004/0232768 A1 | 11/2004 | Hung et al. |
| 2004/0236967 A1 | 11/2004 | Korcharz et al. |
| 2004/0259538 A1 | 12/2004 | Agbegnenow |
| 2004/0268160 A1 | 12/2004 | Atkinson et al. |
| 2005/0010954 A1 | 1/2005 | Binder |
| 2005/0018648 A1 | 1/2005 | Scheelke |
| 2005/0018857 A1 | 1/2005 | McCarty et al. |
| 2005/0047379 A1 | 3/2005 | Boyden et al. |
| 2005/0047431 A1 | 3/2005 | Binder |
| 2005/0053087 A1 | 3/2005 | Pulyk |
| 2005/0063108 A1 | 3/2005 | Voll et al. |
| 2005/0073968 A1 | 4/2005 | Perlman |
| 2005/0076148 A1 | 4/2005 | Chan et al. |
| 2005/0076149 A1 | 4/2005 | McKown et al. |
| 2005/0076151 A1 | 4/2005 | Tapperson et al. |
| 2005/0076375 A1 | 4/2005 | Nakamura |
| 2005/0078700 A1 | 4/2005 | Thompson et al. |
| 2005/0086389 A1 | 4/2005 | Chang |
| 2005/0097369 A1 | 5/2005 | Bowser et al. |
| 2005/0125083 A1 | 6/2005 | Kiko |
| 2005/0125507 A1 | 6/2005 | Atias et al. |
| 2005/0129069 A1 | 6/2005 | Binder |
| 2005/0136972 A1 | 6/2005 | Smith et al. |
| 2005/0136989 A1 | 6/2005 | Dove |
| 2005/0152306 A1 | 7/2005 | Bonnassieux et al. |
| 2005/0152323 A1 | 7/2005 | Bonnassieux et al. |
| 2005/0152337 A1 | 7/2005 | Wurtzel et al. |
| 2005/0177640 A1 | 8/2005 | Rubinstein et al. |
| 2005/0184915 A1 | 8/2005 | Nagel et al. |
| 2005/0201306 A1 | 9/2005 | Engel |
| 2005/0208825 A1 | 9/2005 | Chan |
| 2005/0228889 A1 | 10/2005 | Cohen et al. |
| 2005/0245127 A1 | 11/2005 | Nordin |
| 2005/0268120 A1 | 12/2005 | Schindler et al. |
| 2005/0272372 A1 | 12/2005 | Rodriguez |
| 2005/0273790 A1 | 12/2005 | Kearney |
| 2005/0281326 A1 | 12/2005 | Yu |
| 2006/0006817 A1 | 1/2006 | Chason |
| 2006/0053324 A1 | 3/2006 | Giat et al. |
| 2006/0079969 A1 | 4/2006 | Sequin |
| 2006/0089230 A1 | 4/2006 | Biederman et al. |
| 2006/0104291 A1 | 5/2006 | Rodriguez |
| 2006/0165097 A1 | 7/2006 | Caveney |
| 2006/0168459 A1 | 7/2006 | Dwelley et al. |
| 2006/0181398 A1 | 8/2006 | Martich et al |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 241 152 A2 | 10/1987 |
| EP | 0355532 | 2/1990 |
| EP | 0 961 466 | 12/1999 |
| EP | 1 343 253 A1 | 9/2003 |
| GB | 2 301 743 A | 12/1996 |
| GB | 2 368 979 A | 5/2002 |
| JP | 55132197 A2 | 10/1980 |
| WO | WO 96/23377 | 8/1996 |
| WO | WO 97/50193 A1 | 12/1997 |
| WO | WO 98/37648 A1 | 8/1998 |
| WO | WO 99/03255 A1 | 1/1999 |
| WO | WO 99/12330 A1 | 3/1999 |

| | | |
|---|---|---|
| WO | WO 99/53627 | 10/1999 |
| WO | WO 00/07322 A2 | 2/2000 |
| WO | WO 01/43238 A1 | 6/2001 |
| WO | WO 01/71980 A1 | 9/2001 |
| WO | WO 02/065229 A2 | 8/2002 |
| WO | WO 02/091652 A2 | 11/2002 |
| WO | WO 02/102019 A2 | 12/2002 |
| WO | WO 2004/068827 A1 | 8/2004 |
| WO | WO 2005/022692 A2 | 3/2005 |

### OTHER PUBLICATIONS

Mark Hachman, Compaq to Ride the CEBus, EBN, Jan. 22, 1996, 1 page.

Home Automation Buses: Protocols Really Hit Home, EDN, Apr. 13, 1995, 9 pages.

Brian E. Markwalter, et al; CEBus Router Testing, IEEE Transactions on Consumer Electronics, Nov. 1991, vol. 37, No. 4, 8 pages.

Draft IS-60.04 Node Communications Protocol Part 6: Application Layer Specification, Rev. Apr. 18, 1996, 129 pages.

Gershon, E.; "FDDI on Copper with AMD PHY Components"; Advanced Micro Devices, Inc.; 1991, pp. 1-7.

Lavoisard, J.L. et al; "ISDN Customer Equipments"; Commutation and Transmission, No. 3, 1987, pp. 35-50.

Keller et al; "Performance Bottlenecks in Digital Movie Systems"; Proceedings of the 4th International Workshop on Network and Operating System Support for Digital Audio and Video, 1993, pp. 161-172.

Stallings, W.; "Local Networks—An Introduction"; pp. ii, xii-xvi, 373-381, 1984.

Stallings, W.; "Local Networks—Second Edition" pp. I-v, viii-xiv, 427-434, 1987.

Stallings, W.; "Local Networks—Third Edition" pp. I-v, x-xvi, 499-510, 1990.

Strole, N.; "The IBM Token-Ring Network—A functional Overview"; IEEE Network Magazine, vol. 1, No. 1, 1987, pp. 23-30.

Willett, M.; "Token-ring Local Area Networks—An Introduction"; IEEE Network Magazine, vol. 1, No. 1, 1987, pp. 8 and 9.

"Integrated Services Digital Network (ISDN)", International Telecommunications Union, vol. III, Fascicle III.8, pp. 175-176 and 204-209, 1988.

An Interoperable Solution for FDDI Signaling Over Shielded Twisted Pair; Advanced Micro Devices, Inc.; May 1991, pp. 1-16.

SuperStack II Baseline Switch, 14-Port TP (3C16460) User Guide; 3Com; 1996 pp. 1-8.

SuperStack II Entry Hub User Guide; 3Com; 1996 pp. 1-8.

SuperStack II Baseline Switch 610 User Guide; 3Com; 1999, pp. 1-48.

SuperStack II Baseline 10/100 Switch User Guide; 3Com; 1998, pp. 1-8.

Cisco Catalyst 5000 Switching System; http://web/19961220170336/www.cisco.com; pp. 1-4, 1996.

Cisco Catalyst 5000 Series Documentation; http://web.archive.org/web/19961220192608/www.cisco.com; pp. 1-11, 1996.

Cisco Catalyst 5000 Group Switching Ethernet Modules; http://web.archive.org/web/19961220192604/www.cisco.com; pp. 1-5, 1996.

Cisco Catalyst 5000: Industry's First Modular, Multilayer-Capable Switching System for the Wiring Closet; http://web.archive.org/web/19961220192714/www.cisco.com; pp. 1-22, 1996.

Cisco Catalyst 5000 ATM Dual PHY LAN Emulation Module; http://web.archive.org/web/19961220191454/www.cisco.com; pp. 1-4, 1996.

Cisco LAN Emulation; http://web.archive.org/web/19961220192930/www.cisco.com; pp. 1-16, 1996.

Cisco Fast Ethernet 100-Mbps Solutions; http://web.archive.org/web/19961220192938/www.cisco.com; pp. 1-10, 1996.

Cisco Catalyst 5000: Industry's First Modular, Multilayer-Capable Switching System for the Wiring Closet; Cisco Systems, 1996, pp. 1-22.

Network Based Exchange—The Complete Communications Solution, NBX Corporation, 1997; 16 pages.

The Mac Reborn; Macworld, vol. 13, Issue 9, Sep. 1996, pp. 1-10.

SuperStack II Desktop Switch; 3Com, 1996, 2 pages.

**US 7,522,615 B2**

Page 5

CiscoPro Ether Switch CPW2115; Cisco Systems; 1995, 4 pages.

Hart Field Communication Protocol—an introduction for users and manufacturers; Hart Communication Foundation, 1995, 12 pages.

3ComImpactIQ External ISDN Modem; 3COM, 1996, 4 pages.

The Macintosh Reborn, Macworld—The Essential Macintosh Resource; 1996, 16 pages.

Cisco 2610 Router Cabling and Setup—Quick Start Guide; Cisco Systems, 1998, 18 pages.

Network Based Exchange—The Complete Communication Solution; NBX Corporation, 1997, 16 pages.

-48- Volt DC Power Supply Connection Guide, For the SuperStack II Switch 3900; Mar. 2000, pp. 1-9.

Donnan, et al; "Token Ring Access Method and Physical Layer Specifications"; ANSI/IEEE Standard for Local Area Networks; ANSI/IEEE 802.5; 89 pages, 1985.

Gibson et al; Fibre Data Distributed Interface (FDDI)—Token Ring Physical Layer Medium Dependent (PMD); American National Standard for Information Systems; ANSI X3. 166-1990; 58 pages, 1990.

Gibson et al; Fiber Distributed Data Interface (FDDI)—Token Ring Physical Layer Protocol (PHY); American National Standard for Information Systems; ANSI X3. 148-1988; 34 pages, 1988.

Lohse, et al; Fiber Distributed Data Interface (FDDI)—Token Ring Media Access Control (MAC); American National Standard for Information Systems; ANSI X3. 139-1987; 62 pages; 1987.

IEEE Standard for a High Performance Serial Bus; IEEE Std. 1394-1995; 1996; 392 pages.

SuperStack II PS Hub User Guide; 3com; Jul. 1997; 188 pages.

SuperStack II Desktop Switch User Guide; 3Com; Jun. 1997; 148 pages.

Universal Serial Bus Specification Revision 1.0: Jan. 1996; 268 pages.

ComImpact IQ External ISDN Modem User Guide; Jul. 1997; 158 pages.

Stallings, W., Local Networks, An Introduction, pp. 1-97, 1984.

Universal Serial Bus Specification—Rev. 1.0, Jan. 15, 1996; Sec. 4.2.1 pp. 29-30. cited by other.

Universal Serial Bus Specification—Rev. 1.0, Jan. 15, 1996; Sec. 7.2.1-7.2.1.5 pp. 131-135. cited by other.

Universal Serial Bus Specification—Rev. 1.0, Jan. 15, 1996; Sec. 9.2.1-9.2.5.1 pp. 170-171. cited by other.

Universal Serial Bus Specification—Rev. 1.0, Jan. 15, 1996; Sec. 9.6.2 pp. 184-185. cited by other.

Bearfield, J.M., "Control the Power Interface of USB's Voltage Bus", Electronic Design, U.S., Penton Publishing, Clev. Ohio, vol. 45, No. 15, Jul. 1997, p. 80-86. cited by other.

RAD Data Comm. Ltd., "Token Ring Design Guide", 1994, #TR-20-01/94, Chapters 1 through 4-21. cited by other.

PowerDsine Product Catalogue 1999, pp. 56-79 and 95-105, Israel. cited by other.

ITU-T 1.430 Integrated Services Digital Network—Basic User-Network Interface—Layer 1 Specification. cited by other.



## Figure 1 (Prior Art)



Figure 2 (Prior Art)



Figure 3



Figure 4



**Figure 5**



**Figure 6**



**Figure 7**



**Figure 8**



Figure 9

1

**ADDRESSABLE OUTLET, AND A NETWORK USING SAME**

FIELD OF THE INVENTION

The present invention relates to the field of wired Local Area Networks (LAN's) using outlets, and, more specifically, to an addressable outlet for use in such networks.

BACKGROUND OF THE INVENTION

Outlets

The term "outlet" herein denotes an electromechanical device, which facilitates easy, rapid connection and disconnection of external devices to and from wiring installed within a building. An outlet commonly has a fixed connection to the wiring, and permits the easy connection of external devices as desired, commonly by means of an integrated connector in a faceplate. The outlet is normally mechanically attached to, or mounted in, a wall. Non-limiting examples of common outlets include: telephone outlets for connecting telephones and related devices; CATV outlets for connecting television sets, VCR's, and the like; and electrical outlets for connecting power to electrical appliances. The term "wall" herein denotes any interior or exterior surface of a building, including, but not limited to, ceilings and floors, in addition to vertical walls.

LAN Environment

FIG. 1 shows a typical prior art LAN environment **10**. Such a network commonly uses 10BaseT or 100BaseTX Ethernet IEEE802.3 interfaces and topology, and features a hub **11** as a concentrating device, into which all devices are connected. Devices are connected to the hub **11** by data connectors **14a**, **14b**, and **14c**, which are housed within network outlets **15a**, **15b**, and **15c** respectively. Connections to the hub **11** are via cables **13a**, **13b**, and **13c** respectively. Data connectors **14a**, **14b**, and **14c** may be, for example, type RJ-45 connectors; and cables **13a**, **13b**, and **13c** may be, for example, Category 5 cabling. The data portion of network **10** uses data units (which may be computers) **7a**, **7b**, and **7c**, which connect to network connectors **14a**, **14b**, and **14c** via cables **16a**, **16b**, and **16c**, respectively. A server **12** may also be connected to the hub **11**, and can perform the external connection functionality, as well as other server functions as applied in the art.

Although FIG. 1 refers to the hub **11** as a concentrating device, it is to be understood that any type of device having multiple network interfaces and supporting a suitable connectivity can be used, non-limiting examples of which include shared hubs, switches (switched hubs), routers, and gateways. Hence, the term "hub" herein denotes any such device without limitation. Furthermore, network **10** can be any packet-based network, either in-building or distributed, such as a LAN or the Internet

The topology of network **10** as shown in FIG. 1 incurs various maintenance difficulties. The wiring from the hub **11** to the data unit **7a**, for example, includes wire **13a**, connector **14a** and wire **16a**. Because these conductors are continuous, there is no easy way to distinguish a break or short-circuit in wire **13a** from a break or short-circuit in wire **16a**, nor from a break or short-circuit in connector **14a**. Troubleshooting such failures requires disconnecting cables and inserting dedicated test equipment or making elaborate and thorough substitutions of components that are known to be functional. Such procedures are complicated, labor-intensive, time-consuming, and expensive. Furthermore, in the common case of an outlet to which no data unit is connected, there is no simple

2

way to test the continuity of wiring from the hub to the outlet. In addition, in many cases it is necessary to test the LAN from a remote place (such as via the Internet) in cases where it is not possible to attach testing equipment to non-connected outlets.

Discussion of network management and example of network management system are part of U.S. Pat. No. 5,812,750 to Dev et al.

Home Networking

Most existing offices and some of the newly built buildings facilitate the network structure of network **10**. However, implementing such a network in existing buildings typically requires installation of new wiring infrastructure. Such installation of new wiring may be impractical, expensive and hassle-oriented. As a result, many technologies (referred to as "no new wires" technologies) have been proposed in order to facilitate a LAN in a building without adding new wiring. Some of these techniques use existing wiring used also for other purposes such as telephone, electricity, cable television, and so forth. Doing so offers the advantage of being able to install such systems and networks without the additional and often substantial cost of installing separate wiring within the building. In order to facilitate multiple use of wiring within a building, specialized outlets are sometimes installed, which allow access to the wiring for multiple purposes. An example of home networking over coaxial cables using outlets is described in WO 02/065229 published 22 Aug. 2002 entitled: 'Cableran Networking over Coaxial Cables' to Cohen et al.

The use of such wiring for additional purposes creates a need for ways of easily determining the condition of the wiring and obtaining this information remotely.

Home networking using existing telephone lines will be described as an example.

Definitions and Background

The term "telephony" herein denotes in general any kind of telephone service, including analog and digital service, such as Integrated Services Digital Network (ISDN).

Analog telephony, popularly known as "Plain Old Telephone Service" ("POTS") has been in existence for over 100 years, and is well-designed and well-engineered for the transmission and switching of voice signals in the 3-4 KHz portion (or "band") of the audio spectrum. The familiar POTS network supports real-time, low-latency, high-reliability, moderate-fidelity voice telephony, and is capable of establishing a session between two end-points, each using an analog telephone set.

The terms "telephone", "telephone set", and "telephone device" herein denote any apparatus, without limitation, which can connect to a Public Switch Telephone Network ("PSTN"), including apparatus for both analog and digital telephony, non-limiting examples of which are analog telephones, digital telephones, facsimile ("fax") machines, automatic telephone answering machines, voice modems, and data modems.

The terms "data unit", "computer" and "personal computer" ("PC") as used herein include workstations and other data terminal equipment (DTE) with interfaces for connection to a local area network

In-home telephone service usually employs two or four wires, to which telephone sets are connected via telephone outlets.

Home Networking Over Telephone Lines.

FIG. **2** shows the wiring configuration of a prior-art telephone system including a network **20** for a residence or other building, wired with a telephone line **5**, which has a single wire pair that connects to a junction-box **34**, which in turn

US 7,522,615 B2

**3**

connects to a Public Switched Telephone Network (PSTN) **39** via a cable **33** ('local loop'), terminating in a public switch **32**, which establishes and enables telephony from one telephone to another. The term "high-frequency" herein denotes any frequency substantially above such analog telephony audio frequencies, such as that used for data. ISDN typically uses frequencies not exceeding 100 KHz (typically the energy is concentrated around 40 KHz). The term "telephone line" herein denotes electrically-conducting lines which are intended primarily for the carrying and distribution of analog telephony signals, and includes, but is not limited to, such electrically-conducting lines which may be pre-existing within a building and which may currently provide analog telephony service.

Junction box **34** separates the in-home circuitry from the PSTN and is used as a test facility for troubleshooting as well as for new wiring in the home. A plurality of telephones may connect to telephone lines **5** via a plurality of telephone outlets. Each outlet has a connector (often referred to as a "jack"), commonly being in the form of RJ-11 connectors in North-America. Each outlet may be connected to a telephone unit via a compatible "plug" connector that inserts into the jack.

Wiring **5** is usually based on a serial or "daisy-chained" topology, wherein the wiring is connected from one outlet to the next in a linear manner; but other topologies such as star, tree, or any arbitrary topology may also be used. Regardless of the topology, however, the telephone wiring system within a residence always uses wired media: two or four copper wires terminating in one or more outlets which provide direct access to these wires for connecting to telephone sets.

It is often desirable to use existing telephone wiring simultaneously for both telephony and data networking. In this way, establishing a new local area network in a home or other building is simplified, because there is no need to install additional wiring.

The concept of frequency domain/division multiplexing (FDM) is well-known in the art, and provides means of splitting the bandwidth carried by a wire into a low-frequency band capable of carrying an analog telephony signal and a high-frequency band capable of carrying data communication or other signals. Such a mechanism is described, for example, in U.S. Pat. No. 4,785,448 to Reichert et al. (hereinafter referred to as "Reichert"). Also widely used are xDSL systems, primarily Asymmetric Digital Subscriber Loop (ADSL) systems.

Examples of relevant prior-art in this field are the technology commonly known as HomePNA (Home Phoneline Networking Alliance), WO 99/12330 to Foley and as disclosed in U.S. Pat. No. 5,896,443 to Dichter (hereinafter referred to as "Dichter"). Dichter and others suggest a method and apparatus for applying a frequency domain/division multiplexing (FDM) technique for residential telephone wiring, enabling the simultaneous carrying of telephony and data communication signals. The available bandwidth over the wiring is split into a low-frequency band capable of carrying an analog telephony signal, and a high-frequency band capable of carrying data communication signals. In such a mechanism, telephony is not affected, while a data communication capability is provided over existing telephone wiring within a home.

In addition to illustrating a residential telephone system, FIG. 2 also shows the arrangement of a Dichter network. Network **20** serves both analog telephones and provides a local area network of data units. Data Terminal Equipment (DTE) units **7a**, **7b**, **7c** and **7d** are connected to the local area network via Data Communication Equipment (DCE) units

**4**

**25a**, **25b**, **25c** and **25d**, respectively. Examples of Data Communication Equipment include, but are not limited to, modems, line drivers, line receivers, and transceivers (the term "transceiver" herein denotes a combined transmitter and receiver), which enables data communication over the high spectrum of telephone line **5**. DCE units ('phoneline modems') **25a**, **25b**, **25c** and **25d** are respectively connected to high pass filters (HPF) **24a**, **24b**, **24c** and **24d**, which allow access to the high-frequency band carried by telephone line **5**. In order to avoid interference to the data network caused by the telephones, low pass filters (LPF's) **23a**, **23b**, **23c** and **23d** are added to isolate the POTS carrying band, so that telephones **26a**, **26b**, **26c** and **26d** connects to telephone line **5** for providing PSTN. Furthermore, a low pass filter may also be connected to Junction Box **34** (not shown in the figure), in order to filter noise induced from or input to PSTN wiring **33**.

WO 01/71980 published Sep. 27, 2001 entitled "Telephone Outlet and System for a Local Area Network Over Telephone Lines" in the name of the present inventor and assigned to the present assignee, describes the integration of DCE **25**, HPF **24**, and LPF **23** components into outlets **21** in order to reduce complexity, as shown in FIG. 2. This allows direct connection of telephone sets **6a**, **6b**, **6c**, and **6d** to outlets **21a**, **21b**, **21c**, and **21d**, respectively, via dedicated connectors (as is done in prior-art common telephone outlets), as well as direct and easy connection of data units **7a**, **7b**, **7c**, and **7d** to the respective outlets via dedicated jacks, as is usually done in LAN systems (as shown in FIG. 1).

The topology of network **20** as shown in FIG. 2 exhibits the maintenance difficulties previously discussed. The data flow from data unit **7a** to data unit **7b**, for example, is via wiring **16a**, wiring **5b** and wiring **16b**, as well as connectors such as **22a** and **22b**. Having continuous data flow, there is no easy way to distinguish a short-circuit in wiring **16a** from a short-circuit in wiring **16b**, or from a short-circuit in wiring **5b**, or from a short-circuit in any of the interim connectors. Similarly, a break in the wiring cannot be easily or remotely isolated to wiring **16a** or wiring **16b**. Troubleshooting any of the above failures can only be accomplished by trial and error and requires disconnecting cables **16a**, **16b**, **16c**, and **16d**, and inserting other data units to the outlets. If the failure, however, is in wiring **5c**, more troubleshooting will be necessary, and can ultimately involve disconnecting the entire network. As noted above, this is a complicated, expensive, labor-intensive, and time-consuming effort. Furthermore, in the common case of an outlet into which no data units are connected, there is no simple way to test wiring continuity to the outlet. In addition, as explained in WO 99/03255 to Bell, in many cases it is required to test the LAN from a remote place (e.g. via the Internet), and no local presence is available to approach the disconnected outlets for attaching testers.

U.S. Pat. No. 4,787,082 entitled Data flow control arrangement for local area network (Delaney et al.) published Nov. 22, 1988 discloses a local data distribution network wherein a plurality of bi-directional data distribution busses are each connected to a bus master control circuit at a terminal end of the bus. Connected to each of the data distribution busses are a plurality of passive outlets to which intelligent connectors or stations may be connected. Each station has a unique address and is utilized for individually coupling data processing devices to the bus. A bus termination hub switching facility cooperates with the included group of bus master control circuits to interconnect data processing stations on the various busses. The bus termination hub facility includes bus monitoring, status polling and maintenance facilities. A faulty bus is disconnected if a fault is discovered during monitoring intervals. It remains disconnected until the fault is corrected.

US 7,522,615 B2

5

JP 55132197A2 published Oct. 14, 1980 in the name of Sharp Corporation and entitled "Unit Controlling Electric Equipment Making Use of House Wiring" relates to the control of electrical equipment connected to house wiring. An address information signal is sent through a coupling unit from a transmission controller to house wiring. On the reception side, reception controllers receive the address information signal through coupling units inserted into sockets provided at respective positions of the house wiring. From one of controllers whose incorporated address information agrees with the received address information, answer information is sent back to the transmission side. On the transmission side, an operation command code is sent out upon receiving the answer information from the reception side so as to control electric equipment.

In both above prior art patents, passive outlets are used, hence there is no way to distinguish between a failure in the wiring into which the outlets are connected, and a failure in the wiring/equipment connected to the outlet.

There is thus a widely recognized need for, and it would be highly advantageous to have, a method and system for allowing remote diagnosis of LAN environment outlets without requiring local access to the network and without dismantling the network. This goal is met by the present invention.

SUMMARY OF THE INVENTION

It is an object of the present invention to allow convenient determination of the status of installed wiring within a building, and the outlets and connectors thereto.

It is a further object of the present invention to allow convenient determination of the condition of devices and apparatus connected to the various outlets of an installed wiring system. It is moreover an object of the present invention to permit such determination remotely.

In order to attain these objectives, the present invention provides an outlet having an address which uniquely identifies the outlet within an information network that is established, at least in part, over wiring to which the outlet is connected. Associated with this unique network address is processing circuitry and an addressing unit capable of storing and utilizing the unique network address, to allow the outlet to receive and send messages associated with the address. The processing circuitry interfaces with the network to support such messaging, and may generate content for messages to be sent to other devices on the network, and may likewise receive and process messages sent to the outlet from other devices. The unique network address is associated with both the sending and receiving of messages over the network. In the case of receiving messages, the unique address allows the circuitry in the outlet to discriminate between messages intended for that outlet and messages intended for other devices. In the case of sending messages, the unique address serves to identify the source of the message. Because addresses are associated both with senders and receivers, the processing circuitry may respond to messages sent to the outlet from other devices by sending messages from the outlet to other devices.

Outlets according to the present invention include, but are not limited to, electrical power outlets, telephone outlets, and cable television outlets.

The term "information network" herein denotes any system that allows multiple devices to send and receive information of any kind, wherein each device may be uniquely identified for purposes of sending and receiving information. Information networks include, but are not limited to, data networks, control networks, cable networks, and telephone networks. A data network utilizing outlets according to the

6

present invention can be a local area network (LAN) or part of a wide-area network, including the Internet.

Therefore, according to the present invention there is provided an outlet for use with wiring installed in a building, and having at least one address that uniquely identifies the outlet within an information network.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention is herein described, by way of non-limiting example only, with reference to the accompanying drawings, wherein:

FIG. 1 shows a prior art local area network.

FIG. 2 shows a prior art local area network over telephone lines.

FIG. 3 shows a local area network outlet according to the present invention.

FIG. 4 shows a local area network according to the present invention.

FIG. 5 shows a local area network over telephone lines outlet according to the present invention.

FIG. 6 illustrates the front panel of a telephone outlet according to the present invention.

FIG. 7 shows a local area network over telephone lines according to the present invention.

FIG. 8 illustrates a general form of an outlet according to the present invention, which can serve in various wired network environments, such as CATV and electrical power networks.

FIG. 9 shows a remote-managed local area network according to the present invention.

DESCRIPTION OF THE INVENTION

The principles and operation of a network according to the present invention may be understood with reference to the drawings and the accompanying description. The drawings and descriptions are conceptual only. In actual practice, a single component can implement one or more functions; alternatively, each function can be implemented by a plurality of components and circuits. In the drawings and descriptions, identical reference numerals indicate those components that are common to different embodiments or configurations.

FIG. 3 schematically shows an outlet 30 according to a first embodiment of the invention. As shown in FIG. 3, outlet 30 includes a three-port hub 11. One port goes to a connector 31, which connects the outlet 30 to network wiring as previously described, and as is known in the art (such as to wiring 13a in FIG. 1). Another hub port goes to a connector 38, enabling connection of a data unit as described previously and as is known in the art (such as to data unit 7a via wiring 16a in FIG. 1). The third port goes to a processing unit 36, integrated within outlet 30. Processing unit 36 provides the basic functionality of a data unit (such as data unit 7a of FIG. 1), and principally includes an address unit 37, with a stored address 39, that is unique within the network. For example, in an Ethernet network using interfaces 10BaseT or 100BaseTX according to IEEE802.3, the processing unit 36 may include a MAC (Media Access Control) address or an IP (Internet Protocol) address, as the address 39. In this manner, outlet 30 becomes an addressable entity within the network, and is able to respond to messages carrying address 39, or to transmit messages containing address 39 as a source. Because the outlet 30 is an addressable entity in the network, it is possible to execute remote diagnostics to determine the status and health of the outlet 30. For example, a message calling for a reply can be sent to the outlet 30. Receiving an answer from

US 7,522,615 B2

7

such an outlet confirms the existence of the outlet in the network. as well as the basic functionality of the outlet and any connections to the outlet via which the answer is received. Furthermore, one or more status devices may be integrated in the outlet and addressed either individually or as a group, to providing meaningful data about the outlet status, and the condition of the network in general. Typical status devices are voltage sensors, continuity detectors, hub activity indicators, transducers etc. Network condition includes, but is not limited to, such factors as continuity of wiring, connector status, connected devices, topology, signal delays, latencies, and routing patterns. Although the outlet 30 has been described above as having a single data networking interface 38, multiple interfaces can be supported, each connected to a different port of hub 11. Processing unit 36 may also be capable of analyzing received messages, in order to perform actions in response thereto, as well as composing messages for sending, in order to respond to received messages, or to initiate messages to other devices on the network. For example, processing unit 36 may detect an abnormal condition or emergency situation, and may therefore notify other devices on the network via messages.

Managed devices such as managed hub, managed switch and router are known in the art. Outlet 30 may be viewed as a managed device housed within an outlet.

FIG. 4 shows a Local Area Network (LAN) 40 according to the present invention. Basically, the infrastructure of network 40 is the same as that of prior art network 10 (FIG. 1), in which hub 11 is connected in a 'star' topology to various end units via network wiring 13a and 13b, which are connected respectively to outlets 15a and 15b (in FIG. 1). However, according to the present invention, outlets 15a and 15b of prior-art network 10 are replaced by outlets 30a and 30b, respectively, which contain addressable processing units 36a and 36b, as previously described with reference to FIG. 3. For example, outlet 30a has built-in processing unit 36a, addressing unit 37a, and address 39a. Outlet 30a allows for connection of data unit 7a via a connector 38a using wiring 16a. Similarly, outlet 30b allows data unit 7b to be connected to the network via wiring 16b to a connector 38b. Addressing units 37a and 37b integrated within outlets 30a and 30b, respectively, allow for unique identification of outlets 30a and 30b by addresses 39a and 39b, respectively.

Network 40 offers the advantages of being able to individually address each outlet, hence allowing remote diagnostics. The outlets 30a and 30b of network 40 can now facilitate fault localization. For example, the server 12 will transmit a message to outlet 30a, using outlet 30a address, followed by a message to data unit 7a. In the case wherein outlet 30a responds to the server 12 and data unit 7a does not respond, the most probable scenario is that the connection between the data unit and outlet 30a is faulty or no data unit is connected to outlet 30a. Hence, assuming data unit 7a is connected, the fault is easily limited only to connector 38a, wiring 16a or data unit 7a. Similarly, in the case wherein no reply is received from outlet 30a, the fault is localized to cable 13a, connector 31a or outlet 30a.

Powering the outlet 30 can be implemented either locally, by connecting a power supply to each outlet, or, preferably, via the network itself. In the latter case, commonly known as "Power over LAN", the power can be carried to the outlet from a central location either by an additional wire pair, using the well-known phantom configuration, or by the FDM (Frequency Division/Domain Multiplexing) method. The latter commonly employs DC feeding, which is frequency-isolated from the data carried in the higher part of the spectrum.

8

In another embodiment, the present invention is used in a data network over in-building telephone lines, where analog telephony signals are carried in the low-frequency portion of the spectrum, and data communication signals are carried in the high-frequency portion. FIG. 5 shows an outlet 50 according the present invention, which is able to separate and combine signals in different portions of the spectrum. Outlet 50 connects to the telephone wiring via a connector 22, preferably located at the rear part of outlet 50, where outlet 50 mechanically mounts to an interior wall of the building. A Low Pass Filter (LPF) 23 isolates the analog telephony part of the spectrum for connection to an analog telephone via a jack 56. Jack 56 is preferably a standard telephone jack, such as RJ-11 in North-America. Data communication signals are isolated by a High Pass Filter (HPF) 24, which connects to a Data Communications Equipment (DCE) unit 25, which serves as a modem for data communications over the telephone line media. An integrated hub 11 allows sharing data between processing unit 36, including address unit 37 with address 39, and a data jack 38, for connecting external devices to the network via DCE unit 25. Processing unit 36 with integrated address unit 37 allows messages directed to or from the outlet to be uniquely routed. Outlet 50 supports both standard analog telephony (via jack 56) as well as data communications via jack 38.

FIG. 6 pictorially illustrates the front panel of a telephone outlet 50 according to the present invention, having both telephony connector 56 and data connector 38.

FIG. 7 illustrates a network 70 that operates over telephone lines 5a, 5b, and 5c, and employs outlets 50a and 50b according to the present invention. Network 70 supports regular PSTN telephony service via analog telephone sets 26a and 26b, connected to the telephone connectors of outlets 50a and 50b respectively. Simultaneously, data networking can be accomplished by data units 7a and 7b. Outlets 50a and 50b can each be addressed by any other outlet or data unit in the network using dedicated addresses 39a and 39b, conveyed by address units 37a and 37b, respectively. Similarly, outlets 50a and 50b can address any other entity in the network, and as such both the outlets and the various network segments can be fault isolated as described above.

Although the invention has been so far demonstrated as relating to telephone wiring and telephone outlets, the invention can be similarly applied to any type of wired networking within a building, such as CATV or electrical power wiring. FIG. 8 illustrates an outlet 80, which is a general embodiment of the present invention. Outlet 80 is similar in overall layout to the outlet 50 shown in FIG. 5. Outlet 80 connects to the relevant wiring via a connector 81 and contains an integrated data/service splitter/combiner unit 82, which isolates the data carried over the wiring from the main service signal. In the case of telephony, unit 82 contains a low-pass filter (such as LPF 23a as shown in FIG. 7) and a high-pass filter (such as HPF 24a as shown in FIG. 7). In the case of electrical power wiring, the AC power is split by unit 82 and fed to a socket 84, for supplying electrical power as is normal for such an outlet. In this case, a modem 83 being a power-line carrier (PLC) modem interfaces the hub 11 to the integrated data/service splitter/combiner unit 82 to allow data communication over the power line. Similarly, in the case of a CATV application, where the CATV wiring is used for the network infrastructure, modem 83 is a coaxial cable modem, and unit 82 isolates the CATV signal from the data signal.

Although the invention has been so far described as relating to Ethernet/IP-based data networks, the invention can be similarly applied to any type of data network. Furthermore, although packet networks are the most common for local area

US 7,522,615 B2

9

networks, the invention is not restricted to packet networks only, and can be applied to any digital data network, where network entities are identified uniquely by addresses.

Furthermore, although the invention has been described as relating to networks based on continuous electrical conducting media (telephone, CATV, or electrical power), and the relevant modem and associated circuitry are connected in parallel to the wiring infrastructure, the invention can be applied equally to the case wherein the wiring is not continuous, but is in discrete segments. Such an arrangement is disclosed in WO 0007322 published Feb. 10, 2000 and entitled "*Local Area Network of Serial Intelligent Cells*" in the name of the present inventor and assigned to the present assignee.

Although outlets **30**, **50** and **80** are each described above as having a single data connection, it is to be understood that multiple data network interfaces can be included within an outlet, each connected to different port of the respective hub (such as hub **11***a*, as shown in FIG. **7**).

In addition, although the present invention has been described with respect to a single address associated with each outlet, it will be appreciated that multiple addresses can also be assigned to an outlet. Different addresses can be associated with different data ports and/or with different functionalities of the outlet thus improving fault isolation by separately addressing the addressable data ports or functionalities until an absence of a response signal to a diagnostic message indicates that the addressed port and/or functionality of the outlet is faulty or that there is a break in the connection path thereto.

While the invention has been described with regard to local area networks, wherein the fault is localized locally, it will be appreciated that assigning addresses to outlets facilitates also remote diagnostics and fault localization. Such a network **90** is described in FIG. **9**. Network **90** comprises local area network part similar to network **40** above (Phoneline, CATV or powerline based networks can equally be used). However, an external connection is added to an external network **92**. The connection makes use of a gateway **93**, bridging between the external WAN and the internal LAN, commonly known as Integrated Access Device (IAD), Home or Residential Gateway (RG). For example, the external network can be a Wide Area Network (WAN), either wired or non-wired. For example, the external network **92** can be the Internet. The connection can be via different access technologies such as xDSL (using xDSL modem), CATV based (using Cable Modem or Set Top Box) or wireless (satellite or terrestrial). A remote server **91** is a data unit connected remotely to the WAN **92**, and hence can communicate with the local area network and its components, data units **7***a*, **7***b* and outlets **30***a* and **30***b*. In such an arrangement, fault isolation can be performed remotely, managed by the server **91**. By communicating with the outlets **30***a* and **30***b* and the data units **7***a* and **7***b*, the server **91** can determine the fault localization to a segment level as described above. Furthermore, the remote server **91** may check the system integrity up to the outlets level, even if no data units are connected or operative. In such a case, a Telco (through xDSL connection) or CATV provider (through Cable modem or set-top-box) can remotely test and verify the status of the network within a home.

The invention claimed is:

**1**. An addressable device for coupling packet-based data signals to and from a data unit, for use with service wiring in

10

a building concurrently carrying an analog service signal and the packet-based data signal using frequency division multiplexing, wherein the data signal is carried over a data signal frequency band and the analog service signal is carried over an analog service signal frequency band distinct from the data signal frequency band, and the service signal is one of a telephone signal, a power signal and a CATV signal, the device comprising:

a single housing and, in said single housing;
a wiring connector connectable to the service wiring;
a data filter coupled to the wiring connector for passing only the data signal,
a wiring modem coupled to said data filter and operative to couple to the data signal;
a data connector connectable to a data unit;
a multiport unit comprising a hub, the multiport unit comprising a first port coupled to said wiring modem and a second port coupled to the data connector, said first and second ports being operative to couple data carried by the data signals between said modem and said data connector; and
a processing unit coupled to the multiport unit and comprising an address unit storing an address that uniquely identifies the device,

wherein the processing unit is operative to identify and compose messages associated with said address in a data network, and wherein said housing is attachable to a wall.

**2**. The device according to claim **1**, wherein:
the service wiring is a residential telephone wiring;
the analog service signal is an analog telephone signal; and
the device further comprises:
a low pass filter coupled to the wiring connector for passing the analog telephone signal; and
a telephone connector coupled to said low pass filter for coupling the analog telephone signal to a telephone unit.

**3**. The device according to claim **1**, wherein:
the service wiring is a residential power wiring;
the analog service signal is a power signal; and
the device further comprises:
a low pass filter coupled to the wiring connector for passing the power signal; and
a power connector coupled to said low pass filter for coupling the power signal to an appliance.

**4**. The device according to claim **1**, wherein:
the service wiring is a residential CATV wiring;
the analog service signal is a CATV signal; and
the device further comprises:
a CATV filter coupled to the wiring connector for passing the CATV signal; and
a CATV connector coupled to said CATV filter for coupling the CATV signal to a CATV unit.

**5**. The device according to claim **1**, wherein the data signal is Ethernet based, and the address is one of a Media Access Control (MAC) address and an Internet Protocol (IP) address.

**6**. The device according to claim **1**, further comprising sensors coupled to said processing unit for checking the device status.

**7**. The device according to claim **1**, wherein the device is further operative to be power fed by a power signal carried over the service wiring.

* * * * *

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NOVA MEASURING INSTRUMENTS, LTD.<br>Weizmann Scientific Park<br><br>Rehovot, Israel<br><br>Plaintiff,<br><br>v.<br><br>HON. JOHN J. DOLL<br>Acting Under Secretary of Commerce for Intellectual<br>Property and Acting Director of the United States<br>Patent and Trademark Office<br>Madison Building<br>600 Dulany Street<br>Alexandria, VA 22314<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. ----

# Exhibit B

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

ATTY.'S DOCKET:  BINDER22

| | | |
|---|---|---|
| In re Application of: | ) | Office of the Deputy |
| | ) | Commissioner for Patent |
| Yehuda Binder | ) | Examination Policy |
| | ) | |
| Patent No.:  7,522,615 | ) | Washington, D.C. |
| | ) | |
| Patent Date:  April 21, 2009 | ) | Confirmation No. 2066 |
| | ) | |
| For:  ADDRESSABLE OUTLET, AND… | ) | June 22, 2009 |

REQUEST FOR RECONSIDERATION OF PATENT TERM ADJUSTMENT

Honorable Commissioner for Patents
U.S. Patent and Trademark Office
Customer Service Window
Randolph Building, Mail Stop Petitions
401 Dulany Street
Alexandria, VA 22314

Sir:

Pursuant to 37 CFR 1.705(d), reconsideration of the patent term adjustment indicated on the face of the above-identified patent is hereby requested.

In accordance with 37 CFR 1.705(b)(1), submitted herewith is the fee of $200 as set forth in 37 CFR 1.18(e). If there is any underpayment or any other fee necessary for consideration of this request, please charge same to the deposit account no. 02-4035 of the undersigned.

The following statement of the facts involved is in compliance with 37 CFR 1.705(b)(2).  The correct patent term adjustment is 1414 days.  The period of delay under 37 CFR

Patent No.:  7/522,615
Date: April 21, 2009


1.702(a) is 1287 days, as properly calculated by the PTO.

However, the PTO failed to take into account the period of

delay under 37 CFR 1.702(b).  The period of time from April 7,

2007 (three years after the Filing or 371(c) date) to issuance

of the patent on April 21, 2009, was 745 days.

        37 CFR 1.703(f) provides that the periods of delay

under 1.702 are added together "to the extent that such

periods are not overlapping."  In *Wyeth v. Dudas*, 2008 U.S.

Dist. LEXIS 76063, 88 USPQ2d 1538 (D.D.C. Sept. 30, 2008), the

U.S. District Court for the District of Columbia held that

only periods of actual calendar days overlap between the time

periods of delay calculated under 1.702(a) and 1.702(b) are to

be considered as overlap within the meaning of 1.703(f).

Thus, in this case, the only days of "overlap" are the 618

days of delay under 1.702(a) that occurred after April 7,

2009, which was the commencement of the 1.702(b) delay.  The

669 days of 1.702(a) delay that occurred prior to the

commencement of the 1.702(b) delay must be added to the 745

days of delay under 37 CFR 1.702(b) to determine the total PTO

delay, as per the interpretation required by the *Wyeth* court.

        Thus, the period of patent term adjustment by the

interpretation approved by the court in *Wyeth v. Dudas*, *supra*,

is 1287 + 745 - 618 = 1414 days, minus any period attributed

to applicant's delay (37 CFR 1.704).  The PTO calculated

applicant's delay as 0 days.  Thus, using the PTO's figures

- 2 -

Patent No.:  7/522,615
Date: April 21, 2009


and the court's interpretation, the correct period for patent

term adjustment should have been 1414 days, i.e., 1414 − 0 =

1414 days.  No terminal disclaimer has been filed in this

case.

These issues could not have been raised on or before

the date of payment of the issue fee as the period of

adjustment under 1.702(b) did not become determined until the

patent issued.  Indeed, the PTO does not consider the effect

of the 1.702(b) period until it mails the issue notification.

Accordingly, this request for reconsideration of the patent

term adjustment is timely under 37 CFR 1.705(d).

Granting of this request and modifying the patent

term adjustment afforded this case to a total of 1414 days are

therefore earnestly solicited.


Respectfully submitted,

BROWDY AND NEIMARK, P.L.L.C.
Attorneys for Applicant


By: /rlb/ _____
    Roger L. Browdy
    Registration No. 25,618

RLB:edg
Telephone No.: (202) 628-5197
Facsimile No.: (202) 737-3528

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NOVA MEASURING INSTRUMENTS, LTD. <br> Weizmann Scientific Park <br><br> Rehovot, Israel <br><br> Plaintiff, <br><br> v. <br><br> HON. JOHN J. DOLL <br> Acting Under Secretary of Commerce for Intellectual <br> Property and Acting Director of the United States <br> Patent and Trademark Office <br> Madison Building <br> 600 Dulany Street <br> Alexandria, VA 22314 <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. ---- <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

# Exhibit C



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

BROWDY AND NEIMARK, P.L.L.C.
624 NINTH STREET, NW
SUITE 300
WASHINGTON DC 20001-5303

COPY MAILED

SEP 0 9 2009

OFFICE OF PETITIONS

In re Patent No. 7,522,615     :  DECISION ON REQUEST
Binder                        :  FOR RECONSIDERATION
Issue Date:  April 21, 2009   :  OF PATENT TERM ADJUSTMENT
Application No. 10/491,989    :
Filed: April 7, 2004          :
Attorney Docket No. BINDER22  :

This is in response to the "REQUEST FOR RECONSIDERATION OF
PATENT TERM ADJUSTMENT," filed June 22, 2009, requesting that
the patent term adjustment determination for the above-
identified patent be changed from one thousand two hundred
eighty-seven (1,287) days to one thousand four hundred fourteen
(1,414) days. The request will be treated under 37 CFR
§1.705(d).

The request for reconsideration is granted to the extent that
the determination has been reconsidered; however, the request
for reconsideration of patent term adjustment is **DISMISSED** with
respect to making any change in the patent adjustment
determination under 35 U.S.C. § 154(b) of 1,287 days.

On April 21, 2009, the above-identified application matured into
U.S. Patent No. 7,522,615 with a patent term adjustment of 1,287
days.

This request for reconsideration of patent term adjustment was
timely filed within two months of the issue date of the patent.
See 1.705(d).

Patentee requests recalculation of the patent term adjustment
based on the decision in Wyeth v. Dudas, 580 F. Supp. 2d 138, 88
U.S.P.Q. 2d 1538 (D.D.C. 2008). Patentee asserts that pursuant
to Wyeth, a PTO delay under §154(b)(1)(A) overlaps with a delay
under §154(b)(1)(B) only if the delays "occur on the same day."

Patent No. 7,522,615     Application No. 10/491,989     Page 2

Patentee maintains that a portion of period of adjustment due to
the Three Year Delay by the Office, pursuant to 37 CFR §
1.703(b), 127 of 745 days and the period of adjustment due to
examination delay, pursuant to 37 CFR §1.702(a), of 1,287 days
do not overlap, as these periods do not occur on the same day.

Patentee argues that the period of adjustment due to the Three
Year Delay by the Office, pursuant to 37 CFR § 1.702(b), is 745
days, which is the number of days in the period beginning on the
day after the date that is three years after the date on which
the national stage commenced under 35 U.S.C. 371(f) in an
international application, April 8, 2007, and ending on the date
the patent was issued, April 21, 2009. The commencement date and
the § 371(c) fulfillment date in this case are the same date,
due to applicant's request for early processing and applicant's
submission of § 371(c) requirements prior to the 30 month date.

Patentee asserts that in addition to the three year delay
period, they are entitled to a period of adjustment due to
examination delay, pursuant to 37 CFR §1.702(a) of 1,287 days
for the failure by the Office to mail at least one of a
notification under 35 U.S.C. 132 not later than fourteen months
after the date the application fulfilled the requirements of 35
U.S.C. §371 in an international application, pursuant to
§ 1.702(a)(1). A Notice of Allowance was mailed on December 15,
2008, which was 14 months and 1,287 days after the § 371
fulfillment date.

Under 37 CFR § 1.703(f), Patentee is entitled to a period of
patent term adjustment equal to the period of delays based on
the grounds set forth in 37 CFR §1.702 reduced by the period of
time equal to the period of time during which Patentee failed to
engage in reasonable efforts to conclude prosecution pursuant to
37 CFR §1.704.  In other words, the period of Office delay
reduced by the period of applicant delay.  The period of
reduction of 0 days for applicant delay is not in dispute.
Patentee asserts that the total period of Office delay is the
sum of the period of Three Year Delay (745 days per patentee's
calculation) and the period of Examination Delay (1,287 days,
not in dispute) **to the extent that these periods of delay are
not overlapping.**

Patentee contends there is an overlap of 618 days, from April 8,
2007 to December 15, 2008. Patentees contend that a portion of
the period of delay of 1,287 days for the Office's failure to

mail at least one of a notification under 35 U.S.C. 132 not later than fourteen months after the date the application fulfilled the requirements of 35 U.S.C. §371 in an international application, pursuant to § 1.702(a)(1), from June 8, 2005 to December 15, 2008, overlaps with a portion of the Three Year Delay period, from April 8, 2007 to April 21, 2009. Patentee asserts that the overlapping period is the 618 days running from April 8, 2007 to December 15, 2008.

Accordingly, patentee submit that the total period of Office Delay is 1,414 days, which is the sum of the period of Three Year Delay (745 days) and the period of Examination Delay (1,287 days), reduced by the period of overlap (618 days, per patentee's calculation).

As such, patentees assert entitlement to a patent term adjustment of 1,414 days (745 + 1,287 reduced by 618 overlap -0 for applicant delay).

The patent issued 3 years and 745 days after the application's commencement date. The Office agrees that the action detailed above was not taken within the specified time frames, and thus, a period of adjustment of 1,287 days was entered. At issue is whether Patentee should accrue 127 (adjusted for overlap, per patentee's definition of overlap) days of patent term adjustment for the Office taking in excess of three years to issue the patent, as well as, 1,287 days for Office failure to take a certain action within a specified time frame (or examination delay).

The Office contends that all 745 days overlap. Patentee's interpretation of the period of overlap has been considered and found to be incorrect. Patentee's calculation of the period of overlap is inconsistent with the Office's interpretation of this provision. 35 U.S.C. 154(b)(2)(A) limits the adjustment of patent term, as follows:

> to the extent that the periods of delay attributable to grounds specified in paragraph (1) overlap, the period of any adjustment granted under this subsection shall not exceed the actual number of days the issuance of the patent was delayed.

Patent No. 7,522,615 · Application No. 10/491,989      Page 4

Likewise, 37 CFR 1.703(f) provides that:

> To the extent that periods of delay attributable to the
> grounds specified in §1.702 overlap, the period of
> adjustment granted under this section shall not exceed the
> actual number of days the issuance of the patent was
> delayed.

As explained in *Explanation of 37 CFR 1.703(f) and of the United
States Patent and Trademark Office Interpretation of 35 U.S.C.
154(b)(2)(A)*, 69 Fed. Reg. 34283 (June 21, 2004), the Office
interprets 35 U.S.C. 154(b)(2)(A) as permitting either patent
term adjustment under 35 U.S.C. 154(b)(1)(A)(i)-(iv), or patent
term adjustment under 35 U.S.C. 154(b)(1)(B), but not as
permitting patent term adjustment under both 35 U.S.C.
154(b)(1)(A)(i)-(iv) and 154(b)(1)(B). Accordingly, the Office
implements the overlap provision as follows:

> If an application is entitled to an adjustment under 35
> U.S.C. 154(b)(1)(B), the entire period during which the
> application was pending (except for periods excluded under
> 35 U.S.C. 154(b)(1)(B)(i)-(iii)), and not just the period
> beginning three years after the actual filing date of the
> application, is the period of delay under 35 U.S.C.
> 154(b)(1)(B) in determining whether periods of delay
> overlap under 35 U.S.C. 154(b)(2)(A). Thus, any days of
> delay for Office issuance of the patent more than 3 years
> after the filing date of the application, which overlap
> with the days of patent term adjustment accorded prior to
> the issuance of the patent will not result in any
> additional patent term adjustment. See 35 U.S.C.
> 154(b)(1)(B), 35 U.S.C. 154(b)(2)(A), and 37 CFR
> § 1.703(f). See *Changes to Implement Patent Term
> Adjustment Under Twenty Year Term; Final Rule*, 65 Fed. Reg.
> 56366 (Sept. 18, 2000). See also *Revision of Patent Term
> Extension and Patent Term Adjustment Provisions; Final
> Rule*, 69 Fed. Reg. 21704 (April 22, 2004), 1282 Off. Gaz.
> Pat. Office 100 (May 18, 2004). See also *Explanation of 37
> CFR 1.703(f) and of the United States Patent and Trademark
> Office Interpretation of 35 U.S.C. 154(b)(2)(A)*, 69 Fed.
> Reg. 34283 (June 21, 2004).

The current wording of § 1.703(f) was revised in response to the
misinterpretation of this provision by a number of Patentees.
The rule was slightly revised to more closely track the

corresponding language of 35 U.S.C. 154(b)(2)(A). The relevant portion differs only to the extent that the statute refers back to provisions of the statute whereas the rule refers back to sections of the rule. This was not a substantive change to the rule nor did it reflect a change of the Office's interpretation of 35 U.S.C. 154(b)(2)(A). As stated in the *Explanation of 37 CFR 1.703(f) and of the United States Patent and Trademark Office Interpretation of 35 U.S.C. 154(b)(2)(A)*, the Office has consistently taken the position that if an application is entitled to an adjustment under the three-year pendency provision of 35 U.S.C. 154(b)(1)(B), the entire period during which the application was pending before the Office (except for periods excluded under 35 U.S.C. 154(b)(1)(B)(i)-(iii)), and not just the period beginning three years after the actual filing date of the application, is the relevant period under 35 U.S.C. 154(b)(1)(B) in determining whether periods of delay "overlap" under 35 U.S.C. 154(b)(2)(A).

This interpretation is consistent with the statute. Taken together the statute and rule provide that to the extent that periods of delay attributable to grounds specified in 35 U.S.C. 154(b)(1) and in corresponding §1.702 overlap, the period of adjustment granted shall not exceed the actual number of days the issuance of the patent was delayed. The grounds specified in these sections cover the A) guarantee of prompt Patent and Trademark Office responses, B) guarantee of no more than 3 year application pendency, and C) guarantee or adjustments for delays due to interference, secrecy orders and appeals. A section by section analysis of 35 U.S.C. 154(b)(2)(A) specifically provides that:

> Section 4402 imposes limitations on restoration of term. In general, pursuant to [35 U.S.C.] 154(b)(2)(A)-(C), total adjustments granted for restorations under [35 U.S.C. 154](b)(1) are reduced as follows: (1) To the extent that there are multiple grounds for extending the term of a patent that may exist simultaneously (e.g., delay due to a secrecy order under [35 U.S.C.] 181 and administrative delay under [35 U.S.C.] 154(b)(1)(A)), the term should not be extended for each ground of delay but only for the actual number of days that the issuance of a patent was delayed; See 145 Cong. Rec. S14,718[1]

---

[1] The AIPA is title IV of the Intellectual Property and Communications Omnibus Reform Act of 1999 (S. 1948), which was incorporated and enacted as law as part of Pub. L. 106-113. The Conference Report for H.R. 3194, 106th Cong. 1st Sess. (1999), which resulted in Pub. L. 106-113,

Patent No. 7,522,615      Application No. 10/491,989      Page 6

In this instance, the relevant period under 35 U.S.C.
154(b)(1)(B) in determining whether periods of delay "overlap"
under 35 U.S.C. 154(b)(2)(A) is the entire period from the
application's commencement date through the date it matured into
Patent No. 7,522,615, April 7, 2004 to April 21, 2009. (There
were no periods excluded under 35 U.S.C. 154(b)(1)(B)(i)-(iii)).

1,287 days of patent term adjustment were accorded prior to the
issuance of the patent for the Office failing to respond within
a specified time frame during the pendency of the application.
The 745 days for Office delay in issuing the patent overlaps
with the 1,287 accorded during the pendency of the application.
During that time, the issuance of the patent was delayed by
1,287 days, not 1,287 + 127 (per patentee's definition of
overlap) days. The Office took 14 months and 1,287 days to
issue a first Office action. Otherwise, the Office took all
actions set forth in 37 C.F.R. § 1.702(a) within the prescribed
timeframes. Nonetheless, given the initial 1,287 days of Office
delay and the time allowed within the timeframes for processing
and examination, the patent issued, three years and 745 days
after its commencement date. The Office did not delay 1,287
days and then an additional 127 days. Accordingly, 1,287 days
of patent term adjustment was properly entered since the period
of delay of 745 days attributable to the delay in the issuance
of the patent overlaps with the adjustment of 1,287 days
attributable to ground specified in § 1.702(a)(1). Entry of
both periods is not warranted. Not only did the 618 days
overlap, but rather the entire 745 days overlapped. 1,287 days
was properly determined to be the actual number of days that the
issuance of the patent was delayed, considering the 745 days
over three years.

Accordingly, at issuance, the Office properly entered no
additional days of patent term adjustment for the Office taking
in excess of 3 years to issue the patent.

In view thereof, the Office affirms that the correct revised
determination of patent term adjustment at the time of the
issuance of the patent is 1,287 days.

---

does not contain any discussion (other than the incorporated language) of S. 1948. A section-by-
section analysis of S. 1948, however, was printed in the Congressional Record at the request of
Senator Lott, See 145 Cong. Rec. S14,708-26 (1999)(daily ed. Nov. 17, 1999).

Patent No. 7,522,615      Application No. 10/491,989      Page 7

The Office acknowledges submission of the $200.00 fee set forth in 37 CFR 1.18(e).  No additional fees are required.

Telephone inquiries specific to this matter should be directed to Shirene Willis Brantley, Senior Petitions Attorney, at (571) 272-3230.

*Christina Tartera Donnell*

Christina Tartera Donnell
Senior Petitions Attorney
Office of the Deputy Commissioner
  for Patent Examination Policy